**DOUGLAS AIRCRAFT COMPANY, Inc.,**
and
**Douglas H. Moreton, Plaintiffs,**
v.
**Frederick H. MUELLER, Secretary of Commerce,**
and
**Robert C. Watson, Commissioner of Patents, Defendants.**
Civ. A. No. 905–57.

United States District Court
District of Columbia.
April 25, 1961.

Francis C. Browne, Joseph A. De-Grandi, Washington, D. C., for plaintiffs.

C. W. Moore, Solicitor, U. S. Patent Office, Washington, D. C., for defendants.

SIRICA, District Judge.

Plaintiffs filed an action under 35 U.S. C.A. § 145 seeking a judgment from this Court entitling them to receive a patent on their application, Serial No. 316,325 of October 22, 1952 entitled "Phosphonate Ester Hydraulic Fluid" for use in the hydraulic systems of aircraft operating at the low temperatures of high altitudes. A prior patent, issued to one Watson, also concerning an aircraft hydraulic fluid composition, taught that a mixture of di-octyl styrene phosphonate when combined with certain polymerized methacrylic acid esters (viscosity index-improving agents) produced the desired fluid viscosity at the desired low temperature. Plaintiff Moreton's suggested composition contained a

1. This Court's prior opinion in this case is reported in Douglas Aircraft Co. v. Weeks, D.C.1959, 174 F.Supp. 442.

dibutyl phenyl phosphonate and possessed admitted novelty.

The issue at trial was whether plaintiffs' composition, in the light of the prior Watson patent, met the statutory test of not being obvious to one having ordinary skill in the prior art. At trial, since plaintiffs were claiming unexpected results over a prior patent, it was necessary for them to show comparative tests between the application and the reference. Plaintiffs established that two isomers of the Watson patent were inoperative at the required low temperature (-40°F.). After trial, in their post-trial brief, the Patent Office urged that there was a third isomer of Watson's dioctyl styrene phosphonate, called di-n-octyl styrene phosphonate, and that since plaintiffs had failed to test and show the inoperativeness of this third isomer, they had failed to sustain their burden of proof. Plaintiffs' request to reopen the record to rebut this argument was denied by this Court, and judgment was entered for the defendants.[1]

On appeal, the United States Court of Appeals for the District of Columbia Circuit in its remand of the case,[2] commented on that denial as follows:

"We think this was error in all the circumstances, especially considering the fact that with the use of the two isomers as to which there was test evidence, Watson was found inoperative. When, after trial, the third isomer came on the scene, not by evidence but by briefs, the right to introduce evidence on the subject should have been granted if, *as was the case, the decision might have been different if the new evidence should also support the claim of Moreton that Watson was inoperative. In that event the unexpected result achieved by Moreton, though within the general area of Watson, might well be found to have been a combination not obvious to one ordinarily skilled in the prior art, and this, with admitted novelty, would entitle him*

2. Douglas Aircraft Co. v. Mueller, 1960, 107 U.S.App.D.C. 321, 277 F.2d 351.

*to a successful outcome of his action in the District Court."* 107 U.S.App. D.C. at page 324, 277 F.2d at page 354. (Emphasis added.)

By order of February 27, 1961, this Court scheduled a re-hearing of the case, limited to the question of whether or not the third isomer, di-n-octyl styrene phosphonate, was inoperative. At the hearing, the Court, after referring to the language cited above from the opinion of the Court of Appeals, asked counsel the following question:

"  *  *  *  in view of the language I have just quoted from the opinion of the Court of Appeals, do the plaintiff and defendant agree, that if it is shown that this third isomer, di-normal-octyl styryl phosphonate, is also inoperative, then the Court should decide that plaintiff's composition is the production of unusual and unexpected results, and therefore find for the plaintiff?" (Transcript, p. 4.)

Counsel for plaintiffs replied as follows:

"Mr. Browne: May it please Your Honor, I agree that if inoperativeness is established by the evidence we produce this morning, we are undeniably entitled to receive the patent." (Transcript, p. 4.)

Counsel for defendants replied as follows:

"Mr. Moore:  *  *  *  I agree that if the plaintiffs prove inoperativeness of that specific compound, di-n-octyl styryl phosphonate they would be within the purview of the Court of Appeals decision, for Your Honor to authorize the issuance of a patent." (Transcript, p. 5.)

At the rehearing on this limited issue, plaintiffs called two witnesses. Plaintiffs' witness Sidney M. Collegeman, an employee of the Bureau of Naval Weapons, testified as to the required standards of viscosity of aircraft hydraulic fluids at -40 degrees F. Plaintiffs' witness Christian A. Seil, Chief of the Non-Metallic Section of Materials Research and Process Engineering of the Santa Monica Division of plaintiff Douglas Aircraft

Company, testified concerning the preparation and testing of the third isomer, di-n-octyl styryl phosphonate.

Government counsel offered no evidence in rebuttal and did not cross-examine the witness Collegeman, but relied solely on his cross-examination of the witness Seil.

After considering the evidence offered by plaintiff at the rehearing and the cross-examination of the witness Seil, the Court is of the opinion that plaintiffs have established inoperativeness of the third isomer. Though this is a trial de novo, (Cf., American Steel & Wire Co. of New Jersey v. Coe, 1939, 70 App.D.C. 138, 105 F.2d 17), the defendants, who have access to the largest laboratory facilities in the nation, did not offer any evidence to rebut plaintiffs' evidence of inoperativeness.

After a reconsideration of the entire record of the prior hearing, and after considering the evidence of plaintiffs at the rehearing, the Court feels that if it had had this evidence of the inoperativeness of the third isomer before it at the original hearing, it might have reached a result in favor of the plaintiffs. Considering the entire record, the opinion of the Court of Appeals, plaintiffs' evidence on rehearing and the total failure of the defendants to offer any evidence in rebuttal, the Court finds that the difference between plaintiffs' composition and the prior Watson art is such that the subject matter as a whole would not have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains. The Court finds that the plaintiffs are entitled to receive a patent containing claims 3, 4, 5, 7 and 8, as set forth in Douglas H. Moreton Application Serial No. 316,325, filed October 22, 1952, and the Commissioner of Patents is hereby authorized to issue such a patent. Cf. Stradar v. Watson, 1957, 100 U.S. App. D.C. 289, 244 F.2d 737.

Accordingly, the Court makes the following Findings of Fact and Conclusions of Law:

### Findings of Fact

1. Douglas H. Moreton, applicant for patent, and his assignee, Douglas Air-

craft Company, Inc., brought this action under 35 U.S.C. § 145, to authorize the Commissioner of Patents to issue Letters Patent to them containing claims 3, 4, 5, 7 and 8 of the application for patent of Douglas H. Moreton entitled, "Phosphonate Ester Hydraulic Fluid," Serial No. 316,325, filed October 22, 1952.

2. Generic claim 8, and claims 3, 4, 5 and 7, dependent thereon, in suit, read as follows:

"8. The composition consisting essentially of dibutyl phenyl phosphonate and a sufficient proportion of a poly alkyl methacrylate the alkyl groups of which have from 4 to 6 carbon atoms and said poly alkyl methacrylate has an average molecular weight within the range of 2,000 to 12,000 and a molecular weight range of 1,500 to 14,000 to increase the viscosity of the composition at 210°F. above 3.0 centistokes and to increase the viscosity index of the composition above 150, said composition having a viscosity at -40° F. Below 1000 centistokes and an autogenous ignition temperature above 1000°F.

"3. The composition as defined in claim 8 in which said poly alkyl methacrylate is poly butyl methacrylate.

"4. The composition as defined in claim 8 in which said poly alkyl methacrylate is poly amyl methacrylate.

"5. The composition as defined in claim 8 in which said poly alkyl methacrylate is poly hexyl methacrylate.

"7. The composition as defined in claim 8 having from 0.2 to 10 per cent of said poly alkyl methacrylate."

3. The compositions defined by the claims in suit are described in the Moreton application as being useful as hydraulic fluids and particularly as hydraulic fluids for aircraft use. As the Moreton application indicates, a hydraulic fluid for aircraft use should have a viscosity which is reasonably high at high temperatures and not too high at low temperatures. In addition, the rate of change of viscosity in relation to changes in temperature should be low. The pour point should be low so that the fluid will flow, or pour, at low temperatures; the volatility at operating temperatures should be such as to avoid evaporation or vaporization; and the compositions should have lubricity, or capability of acting as a lubricant, chemical stability, nonflammability (with a high autogenous ignition temperature) and inertness.

4. According to the Moreton application "hydraulic fluids surprisingly satisfactory for aircraft hydraulic systems can be made by compounding a relatively major portion of dibutyl phenyl phosphonate with a relatively minor proportion of an agent effective to increase the viscosity index and viscosity at elevated temperatures of the dibutyl phenyl phosphonate, particularly a polymerized alkyl methacrylate (poly alkyl methacrylate)." The Moreton application states that the "number of carbon atoms in the alkyl group [of the polymerized *alkyl* methacrylate] should be such that the polymer is compatible with the particular phosphonate used and for dibutyl phenyl phosphonate the alkyl group should have from 2 to 6 carbon atoms * * *." The Moreton application makes the following statements with reference to the molecular weight of the polymerized alkyl methacrylate additives:

"The molecular size of the polymerized alkyl methacrylate should be great enough to increase the viscosity of the dibutyl phenyl phosphonate to which added and small enough to be compatible therewith as is generally understood with regard to improvement in viscosity index. In general the average molecular weight should be within 2,000 to 12,000 and the molecular weight range from about 1,500 to 14,000. The poly alkyl methacrylate should be such and in sufficient proportion to increase the viscosity at elevated temperatures, for example, at 210°F. to at least about 3.0 centistokes, and to increase the viscosity index, for ex-

ample, to above 100, and preferably to above 150."

5. The patent to Forrest J. Watson, No. 2,636,862, issued April 28, 1953, on an application filed June 9, 1950, pertains "to compositions containing one or more organic phosphorus containing compounds, e. g., organic phosphates, phosphonates, phosphinates, etc., and a combination of additives which produce stable, non-corrosive compositions, such as improved fluids especially suitable for use as lubricants and in hydraulic mechanisms, particularly aircraft hydraulic apparatus." The patent describes the "combination of additives," in column 2, line 25, as "two particular types of additives," namely, a combination of "minor amounts of an epoxy compound and an organic sulfur containing compound," The Watson patent refers to the rigorous requirements for hydraulic fluids, including non-corrosivity and resistance to oxidation, and discloses as desirable properties, particularly for aircraft hydraulic fluids, "fluidity over a wide range of temperatures, as least as low as about -40°F. to about -60°F. or higher and non-flammability." The patent lists, among the organic phosphorous containing compounds which are useful, a "mixed alkyl aryl phosphonate, for example an alkyl aromatic phosphonate such as dioctyl styrene phosphonate."

6. In order to improve viscosity characteristics, the Watson patent indicates compositions possessing lubricating properties, especially hydraulic fluids, usually contain viscosity index-improving fluids. Among such viscosity index-improving fluids the patent includes "polymerized methacrylic acid esters,"—preferably with a molecular weight between 5,000 and 15,000 and with the alcohol portion of the ester, the "alkyl radical," derived from alcohols of two to fifteen carbon atoms. Watson identifies these compounds as those sold under the trade names Acryloid and, more specifically, Acryloid HF855 and Acryloid HF–8125.

7. The dibutyl phenyl phosphonate and poly alkyl methacrylate constituents of the compositions claimed in the More-ton application fall within the general classes of, respectively, the mixed alkyl aromatic phosphonates and the polymerized methacrylic acid esters disclosed by the Watson patent as being effective for use in hydraulic fluids. Watson does not disclose the specific compositions claimed by plaintiffs. The compositions claimed by plaintiffs possess novelty.

8. Plaintiffs demonstrated by laboratory tests the apparent effectiveness of a dibutyl phenyl phosphonate-polymerized butyl methacrylate composition as an aircraft hydraulic fluid. A material designated "Di-Iso-Octyl Styryl Phosphonate" and another material designated "Di-2-Ethylhexyl Styryl Phosphonate," both of which are isomers of di-octyl styryl phosphonate, were shown by plaintiffs to have such a high kinematic viscosity at -40° Fahrenheit, 40,000 centistokes and 162,000 centistokes, respectively, that they would not be useful for aircraft hydraulic fluids. When poly-butyl methacrylate was added to these materials the viscosity at -40° Fahrenheit was increased. When 5% of a material designated "HF855 or "Acryloid HF855", both of which are polymethacrylates, and also designated "Polyoctyl methacrylate," was added to the "Di-2-Ethylhexyl Styryl Phosphonate" the viscosity was increased to 178,000 centistokes (as compared with 209,000 centistokes achieved by adding 5% of "polybutyl methacrylate").

A third isomer, namely di-normal-octyl styryl phosphonate, was shown, by itself, to have kinematic viscosity at -40°F. of 19,200 centistokes. A composition containing di-normal-octyl styryl phosphonate and 2% by weight of the aforesaid Acryloid HF855 was shown to have an even higher kinematic viscosity, namely 23,000 centistokes at -40°F. A composition containing di-normal-octyl styryl phosphonate and 5% by weight of Acryloid HF855 was shown to have a still higher kinematic viscosity at -40°F., namely 26,900 centistokes. Expert testimony established that a fluid having a kinematic viscosity greater than 15,000 centistokes at -40°F. is inoperative as an aircraft hydraulic fluid.

9. Neither the average molecular weight nor the range of molecular weights was given for any of the "polybutyl methacrylate" materials used in plaintiffs' tests, nor for the material variously designated "HF855," "Acryloid HF855," and "polybutyl methacrylate," but these materials were obtained from their normal commercial source.

10. The "di-iso-octyl styryl phosphonate" which plaintiffs used was the subject of one of plaintiffs' viscosity determinations and was purchased under that name by plaintiffs from Victor Chemical Company. Another isomer, "di-2-ethylhexyl styryl phosphonate," was described as being prepared on special order by "a Dr. Woods of the University of Maryland." According to plaintiffs' witness Christian A. Seil, an infra-red analysis was run on the "di-2-ethylhexyl styryl phosphonate" to confirm that it had the phosphonate linkages and the alkyl linkages, and the standard for this analysis was a phosphonate supplied to the plaintiffs by Victor Chemical Company. Still another isomer, di-n-octyl styryl phosphonate, was prepared by plaintiffs and determinations in accordance with normally accepted tests confirmed the chemical nature of this compound.

11. Plaintiffs have established by undisputed evidence that the "dioctyl styrene phosphonate" mentioned by Watson (in three isomeric forms, namely di-iso-octyl styrene phosphonate, di-2-ethylhexyl styrene phosphonate and di-n-octyl styrene phosphonate) is inoperative as a hydraulic fluid.

12. In view of the inoperativeness of three isomers of the di-octyl styryl phosphonate mentioned by Watson, the subject matter of the plaintiffs' claimed invention, as a whole, would not have been obvious at the time the invention was made to a person having at least ordinary skill in the aircraft hydraulic fluid art.

■ 13. The evidence adduced in this case provides a basis for a definite and firm conviction that a mistake was committed by the Patent Office in its finding that plaintiffs' hydraulic fluid, as defined in the claims in suit, is not patentable over the patent to Watson, No. 2,636,862.

14. Claims 3, 4, 5, 7 and 8 of the Moreton application, Serial No. 316,325, are patentable over the patent to Watson, No. 2,636,862.

### Conclusions of Law

■ 1. A patent may be obtained if the difference between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would not have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

2. When a composition is found to be inoperative for the purpose disclosed, it would be unobvious to one skilled in the art to expect that a particular composition having as the essential component a different chemical compound, but from the same general class, would possess the necessary properties and therefore be operative for the same purpose.

■ 3. When a chemical compound coming within a broad or general class, disclosed in a prior art reference, is inoperative for the purposes claimed by an applicant against whom the reference is cited, operativeness of a different chemical compound, even though included in the same broad or general class, for the purposes claimed by the applicant is unexpected and therefore patentable over such reference.

4. Since three isomers of di-octylstyryl phosphonate, per se, or in combination with a minor amount of a polyalkyl methacrylate are all inoperative as a hydraulic fluid composition for an aircraft hydraulic system operating at temperatures as low as -40°F., it would not be obvious to one having ordinary skill in the art that a hydraulic fluid composition consisting essentially of dibutyl phenyl phosphonate and from 0.2 to 10% by weight of a polyalkyl methacrylate wherein the alkyl has from 4 to 6 carbon atoms, would be operative and satisfactory as a hydraulic fluid for aircraft hydraulic systems operating as low as -40°F.

5. It is the Court's responsibility, in an equity proceeding, to determine the precise weight to be given to each item of testimony and each item of physical evidence. It must consider all factors that might affect the testimony, such as interest, bias or relationship to one of the parties, as well as the failure of the other party to introduce any contrary evidence. This is especially important where the defendant presents no evidence and the Court relies upon the testimony of the patent applicant and of employees of the assignee of the patent application, together with an interpretation of the factual data by a hydraulic fluid expert from the Federal Government; and the cross-examination of plaintiffs' witnesses by Government counsel produces no evidence or admissions which contradict plaintiffs' proofs.

6. Plaintiffs are entitled to a patent containing claims 3, 4, 5, 7 and 8 of the Moreton application, Serial No. 316,325, in suit.